**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HENNADIY LEONIDOVICH HUSYEV;
TETYANA HRYHORIVNA HUSYEVA,
                    *Petitioners,*

            v.

MICHAEL B. MUKASEY, Attorney
General,
                    *Respondent.*

No. 05-75177

Agency Nos.
A79-290-596
A79-290-597

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
December 5, 2007—San Francisco, California

Filed June 16, 2008

Before: Betty B. Fletcher, William C. Canby, Jr., and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Canby

## COUNSEL

Stacy Tolchin, Van Der Hout, Brigagliano & Nightingale, LLP, Los Angeles, California, for the petitioners.

Stephen J. Flynn (briefs), Colette J. Winston (oral argument), United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, DC, for the respondent.

## OPINION

CANBY, Circuit Judge:

Hennadiy Leonidovich Husyev, a native and ethnic Russian and a citizen of Ukraine, petitions for review of final orders

of the Board of Immigration Appeals ("BIA") denying relief from removal. Husyev originally entered the United States on a tourist visa. He overstayed his visa and, 364 days after the expiration of his temporary nonimmigrant status, applied for asylum. The Immigration Judge ("IJ") and the BIA denied Husyev's application as untimely. They held that, although Husyev's legal status as a tourist could constitute an "extraordinary circumstance" justifying his failure to file an asylum application within one year of arrival, *see* 8 U.S.C. § 1158(a)(2)(D), he had failed to file his asylum application within a "reasonable period" after expiration of his legal status, *see* 8 C.F.R. § 1208.4(a)(5)(iv). We conclude, as a matter of first impression in this circuit, that we have jurisdiction under the REAL ID Act, Pub. L. No. 109-13, Div. B (2005), to review this determination. Exercising such review, we affirm the decision of the BIA.

During his removal proceedings, Husyev also sought withholding of removal and relief under the Convention Against Torture, which the IJ and the BIA denied. We also affirm these rulings of the BIA, and accordingly deny Husyev's petition for review.[1]

## BACKGROUND AND PROCEDURAL HISTORY

### I. Husyev's Asylum Application

Husyev was born in Russia but moved to Ukraine with his family when he was a child in the 1950s. He later became an accomplished pole vaulter and represented the Soviet Union

---

[1]After the BIA dismissed his appeal, Husyev filed a motion to reopen the asylum proceedings on behalf of himself and his spouse, claiming that prior counsel had provided ineffective assistance. The BIA denied the motion, and the Husyevs petitioned for review of that decision as well. The two petitions for review have been consolidated. We address the BIA's denial of the motion to reopen in a separate, unpublished memorandum disposition in No. 06-71826, which is filed contemporaneously with this opinion.

in the Olympic Games in 1972. He subsequently became a physician specializing in sports medicine and worked at the College of Physical Education of West Ukraine. He is a Ukrainian citizen. His spouse, Tetyana Hryhorivna Husyeva (Husyeva), is an ethnic Russian, but a native and citizen of Ukraine.

The Husyevs entered the United States on November 20, 1999, on tourist visas that authorized them to remain in the country until May 19, 2000. They remained in the United States after expiration of their visas. Husyev filed an application for asylum on May 18, 2001. In his asylum application, Husyev stated that he was requesting asylum because of "past persecution based on [his] Russian [e]thnicity" and his "well founded fear of persecution" if forced to return to Ukraine. Husyev stated that, as ethnic Russians, he and his family "were part of an ethnic minority living among a majority of ethnic Ukrainians" and had been "harassed and mistreated" by members of the UNA-UNSO party, a Ukrainian nationalist group.

Husyev submitted a declaration in which he described in detail several instances in which he and his immediate family suffered verbal and physical abuse at the hand of members of Ukranian nationalist groups. He also stated that both he and his wife lost their jobs on account of their Russian heritage. In his application, Husyev did not mention that he participated in any form of political advocacy or public activity that would cause nationalist groups to target him.

Husyev was interviewed by an asylum officer in the presence of his then attorney, Larry James. According to the asylum officer's notes, Husyev admitted that he did not apply for asylum within one year of his arrival, but asserted that he had not done so because he had been told that only Jews from Ukraine were receiving asylum, not Russians. The officer concluded that "there were extraordinary circumstances excepting [Husyev] from the one-year filing deadline"

because he initially had lawful status, but also found that Husyev did not file his application within "a reasonable period of time" after his lawful status ended.

## II.   The Removal Proceedings

In removal proceedings before the IJ, Husyev argued a new set of extraordinary circumstances—namely, the fraud and malfeasance of a paralegal the Husyevs had hired—to excuse his noncompliance with the one-year bar. According to his brief, "Mr. Husyev and his family became victims of a shameless swindler" named Boris Kaplan, who took their money and then failed to file their asylum application.

Along with the brief, new counsel retained by the Husyevs prior to the commencement of their removal proceedings, Christopher Kerosky, submitted affidavits from friends and family asserting that, because of their Russian ethnicity, the Husyevs had experienced great difficulties while living in Ukraine and that they will face "persecution, unfairness, prejudice, and discrimination" if forced to return to Ukraine. He also submitted photos and press cuttings regarding his role as an Olympic athlete; a copy of a letter dated September 15, 2003 addressed to Boris Kaplan informing Kaplan that the Husyevs intended to file a complaint against him; a copy of a request for investigation of Boris Kaplan submitted to the State Bar of Illinois; and medical records indicating that Husyev displayed traumatic injuries in January 1999 and March 1994.

At his first merits hearing before the IJ, Husyev testified to the discrimination he experienced at work and the attacks described in his initial application. Husyev then testified for the first time that, when he was in Ukraine, he had made "public appearances and speeches for human rights issues." He contended that in approximately fifteen speeches, he expressed the view that "all nations, Russians, Ukrainians, Jews and whatever nations there were, had to co-exist in a

new country, in Ukraine," but stopped giving speeches after he was beaten at the end of one of the speeches.

After the hearing was recessed, Husyev submitted a new declaration, in which he detailed his dealings with the paralegal, Boris Kaplan, and described the political speeches he gave in Ukraine. In his declaration, Husyev stated that he "started speaking out against nationalism" after the fall of the Soviet Union and that "[f]rom August 1991 until January 1992, [he] gave about 15 such political speeches." At the speeches, "members of UNA-UNSO tried to physically block [his] way to the platform" and "tried to muffle [his] voice." After one of these speeches, he was "beaten by a group of thugs associated with this ultra-nationalist organization."

When Husyev's hearing continued, he testified further to his dealings with Kaplan. On cross-examination, he acknowledged that he did not mention Kaplan in his asylum interview. He denied being asked by the asylum officer why he did not file within the one-year deadline and claimed that his attorney at the time had told him that his application was not late, leading him to believe that the information about Kaplan was irrelevant.

In an oral decision, the IJ examined Husyev's testimony about Kaplan and compared it to his statements to the asylum officer, concluding that "[q]uite clearly, the respondent has presented two dramatically different versions of events." The IJ decided that he was "constrained to find that respondent has not timely filed his application" because "respondent provided no plausible or believable explanation, when asked at the Asylum Office why he had not filed sooner, for his failure to mention Mr. Kaplan and Mr. Kaplan's malfeasance." He also noted the lack of corroboration of any of the alleged activities of Mr. Kaplan. The IJ then ruled that Husyev had failed to demonstrate by clear and convincing evidence that he had filed within a reasonable time after the expiration of

his legal status. He accordingly denied Husyev's application for asylum as untimely.

Turning to Husyev's application for withholding of removal and relief under the Convention Against Torture (CAT), the IJ noted that in his initial declaration and again before the asylum officer, Husyev "failed to mention that he had given some fifteen public speeches attacking Ukrainian Nationalists and that it was because of these speeches, at least in part, that he became well known and a target of the Ukrainian Nationalists." The IJ also emphasized that he would have expected that Husyev could produce documentary evidence of his fifteen public speeches, and "the failure to corroborate his claim . . . undermine[d] [Husyev's] credibility." The IJ went on to note that Husyev's version of the story was also implausible in light of the documentary evidence presented in the record, including evidence of country conditions. He therefore concluded that Husyev's testimony was not credible. As a consequence, Husyev had failed to establish past persecution or the likelihood of future persecution. The IJ also found that, in the alternative, "the respondent cannot show any realistic possibility that he would be persecuted in the Ukraine and certainly no possibility that he would be persecuted country wide in Ukraine." The IJ found that Husyev "could relocate to another part of the Ukraine" where a majority of the population identifies itself as ethnically Russian. The IJ accordingly denied withholding of removal. He then went on to deny relief under the Convention Against Torture.

Husyev appealed to the BIA. The BIA dismissed the appeal, adopting and affirming the decision of the IJ. This petition for review followed.

## DISCUSSION

We review *de novo* questions of law, *Monjaraz-Munoz v. INS*, 327 F.3d 892, 895 (9th Cir. 2003). We do not accord *Chevron* deference to the BIA's interpretation of the govern-

ing statutes and regulations because it is in an "unpublished disposition . . . issued by a single member of the BIA." *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1113 (9th Cir. 2007); *cf. Chevron USA, Inc. v. NRDC*, 467 U.S. 837 (1984) (explaining that courts grant substantial deference to an agency's reasonable interpretation of an ambiguous statute, when a statute falls within the subject-matter jurisdiction of a federal agency.). We review all factual findings for substantial evidence. *Monjaraz-Munoz*, 327 F.3d at 892.

In upholding the IJ's denial of Husyev's applications for asylum, withholding of removal and relief under the Convention Against Torture, the BIA "adopt[ed] and affirm[ed] the decision of the Immigration Judge," citing *Matter of Burbano*, 20 I. & N. Dec. 872 (BIA 1994). "[W]here the BIA cites its decision in *Burbano* and does not express disagreement with any part of the IJ's decision, the BIA adopts the IJ's decision in its entirety." *Abebe v. Gonzales*, 432 F.3d 1037, 1040 (9th Cir. 2005) (en banc). We therefore review the decision of the IJ, as well as any additional reasoning offered by the BIA.

## I.  Asylum

### A.  Jurisdiction to Review "Extraordinary Circumstances"

The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), ordinarily requires an asylum application to be filed "within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). An exception, however, permits an application to be considered if the alien "demonstrates to the satisfaction of the Attorney General . . . extraordinary circumstances relating to the delay in filing the application" within the required one year. 8 U.S.C. § 1158(a)(2)(D). A regulation sets forth examples of extraordinary circumstances, including the one under which Husyev attempted to qualify:

> The applicant maintained . . . lawful immigrant or
> nonimmigrant status . . . until a reasonable period
> before the filing of the asylum application.

8 C.F.R. § 1208.4(5)(iv). The IJ and the BIA ruled that
Husyev had failed to meet this requirement because he waited
364 days—more than a reasonable period— after expiration
of his legal status before filing his asylum application.

**[1]** A threshold question is whether we have jurisdiction to
review this determination. There are two potential obstacles to
our jurisdiction. The first is 8 U.S.C. § 1158(a)(3), which pro-
vides that "[n]o court shall have jurisdiction to review any
determination of the Attorney General" regarding the one-
year bar or its exceptions for changed or extraordinary cir-
cumstances. Standing alone, that provision clearly would pre-
clude our jurisdiction. In 2005, however, Congress enacted
the REAL ID Act, which dramatically altered the effect of
statutes stripping us of jurisdiction to review BIA decisions.
Pub. L. No. 109-13, Div. B, § 106(a)(1)(A)(iii), 119 Stat. 231,
310 (May 11, 2005) (codified at 8 U.S.C. § 1252(a)(2)(D)).
Under the REAL ID Act, "[n]othing in . . . any . . . provision
of this chapter . . . which limits or eliminates juridical review,
shall be construed as precluding review of constitutional
claims or questions of law." 8 U.S.C. § 1252(a)(2)(D). The
jurisdictional prohibition of § 1158(a)(3) is accordingly over-
ridden by the REAL ID Act for questions of law and constitu-
tional claims. We so held in *Ramadan v. Gonzales*, 479 F.3d
646, 650 (9th Cir. 2007) (per curiam).

**[2]** The crucial question, therefore, is whether Husyev has
presented a question of law in his claim to "extraordinary cir-
cumstances" arising from a legal status maintained until a
"reasonable period" before the filing of an asylum applica-
tion. We conclude that his claim does present a question of
law. Here, too, we rely on *Ramadan*, which held that a deter-
mination of the different but analogous issue of "changed cir-
cumstances" presented a question of law when it required the

application of statutes and regulations to undisputed facts. *Id.* at 656-57. The issue in *Ramadan* arose from the same statutory clause as the issue in our case: that portion of § 1158(a)(2)(D) that permits late applications for asylum to be considered upon a demonstration of "either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application. . . ." *Ramadan* held that "our jurisdiction over 'questions of law' as defined in the Real ID Act includes not only 'pure' issues of statutory-interpretation, but also application of law to undisputed facts, sometimes referred to as mixed questions of law and fact." *Id.* at 648. It therefore concluded that the "changed circumstances" ruling, which clearly presented a mixed question of law and fact, was reviewable pursuant to Section 106 of the REAL ID Act. *Id.*

**[3]** The parallel of *Ramadan* to our case is apparent. Mixed questions of law and fact are those "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982). The facts underlying Husyev's application—the dates of his arrival, the expiration of his legal status, and his application for asylum—are not in dispute. The issue is how the statute and regulation apply to those facts. We conclude, therefore, that this case, like *Ramadan*, presents a question of law not subject to the jurisdictional restriction of § 1158(a)(3) on review of timeliness rulings in asylum cases.

**[4]** The second potential obstacle to our jurisdiction is treated in divergent ways in our precedents, but is equally surmountable. It is the restriction on jurisdiction to review discretionary determinations, which provides, with certain exceptions, that

> no court shall have jurisdiction to review . . . any . . . decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

8 U.S.C. § 1252(a)(2)(B). One of the express exceptions to this prohibition, however, is the provision of the REAL ID Act preserving our jurisdiction to review constitutional claims or questions of law, § 1252(a)(2)(D). Even in the absence of such an exception in subsection (B), the terms of § 1252(a)(2)(D) would preserve our jurisdiction over questions of law because it provides that "[n]othing in subparagraph (B) [denying jurisdiction over discretionary decisions] . . . , or in any other provision of this chapter . . . which limits or eliminates judicial review, shall be construed as precluding review of constitutional claims or questions of law raised upon a petition for review. . . ." *Id.* Thus, we held in *Afridi v. Gonzales*, that "[t]he plain language of the REAL ID Act grants jurisdiction to appellate courts to review questions of law presented in petitions for review of final orders of removal, even those pertaining to otherwise discretionary determinations."). 442 F.3d 1212, 1218 (9th Cir. 2006).

**[5]** The clear text of § 1252(a)(2)(D) and our precedent in *Afridi* accordingly suggest that it makes no difference whether a determination of "extraordinary circumstances" is within the discretion of the Attorney General, because we have concluded that it presents a question of law. The REAL ID Act restores our jurisdiction to address such a question of law despite any statutory restrictions on our jurisdiction over discretionary decisions.

A contrary conclusion is reached, however, in *Ramadan*, which stated that "Section 106 [of the REAL ID Act] does not restore jurisdiction over discretionary determinations." *Ramadan*, 479 F.3d at 654. In accord with that statement, *Ramadan*

examined whether the question of "changed circumstances," which it had determined to present a question of law, was committed to the discretion of the Attorney General. *See id.* at 655-56. Thus *Ramadan* points in a different direction from the text of the REAL ID Act and *Afridi*, and suggests that we must address whether the determination of "extraordinary circumstances" is a discretionary question even though we have determined that it presents a question of law.[2]

We need not resolve this question, however, to reach a result in our case. It makes no difference whether or not we are required to satisfy ourselves that a determination of "extraordinary circumstances" is not a discretionary decision. If we are not required to do so, then we have jurisdiction to decide "extraordinary circumstances" as a question of law. If we are required to satisfy ourselves that the issue is not a discretionary one, *Ramadan* itself supplies the authority for ruling that the issue is *not* discretionary. In its examination of the parallel issue of "changed circumstances," *Ramadan* firmly rejects the contention that the issue is a discretionary question. *See id.* at 654-56. This reasoning of *Ramadan* is equally applicable to the determination of "extraordinary circumstances" in our case. The asylum statute provides that an alien seeking to file an asylum application more than one year after arrival must demonstrate either "changed circumstances" (as in *Ramadan)* or "extraordinary circumstances" (is in our case) "to the satisfaction of the Attorney General." 8 U.S.C. § 1158(a)(2)(D). *Ramadan* made clear that the latter phrase "is a specification of *who* is to make the decision, rather than a characterization of that decision itself." *Ramadan*, 479 F.3d

---

[2]We are aware of decisions from other circuits holding that discretionary decisions in general were not intended by Congress to be made reviewable under the REAL ID Act. *See, e.g., Chen v. U.S. Dept. of Justice*, 434 F.3d 144, 151-55 (2d Cir. 2006); *Grass v. Gonzales*, 418 F.3d 876, 878-79 (8th Cir. 2005). These decisions support the view of *Ramadan*, but are in conflict with *Afridi* and seem to accord no effect to that part of the REAL ID Act that provides for jurisdiction over questions of law notwithstanding the prohibition on review of discretionary determinations.

at 655. Because Congress ordinarily is very explicit when it provides for decisions "in the discretion" of the Attorney General, *Ramadan* concluded that no commitment to discretion had been made in § 1158(a)(2)(D). *See id.* This reasoning of *Ramadan* necessarily applies to both "changed circumstances" and "extraordinary circumstances." In addition, we can find no difference in the nature of the two issues that would require or permit different results in *Ramadan* and our case.

The government argues, however, that the nature of the determination of "extraordinary circumstances" is inherently so lacking in measurable standards that it presents one of the "rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). If there is no law to apply, the issue presumably would not present a "question of law" within the meaning of the REAL ID Act. The government relies on cases holding unreviewable determinations such as "exceptional and extremely unusual hardship," *Romero-Torres v. Ashcroft*, 327 F.3d 887, 891 (9th Cir. 2003), and "extreme cruelty," *Perales-Cumpean v. Gonzales*, 429 F.3d 977, 981-84 (10th Cir. 2005).

We reject the government's contention. The term "extraordinary circumstances" is not rendered standardless by the fact that Congress left the Attorney General and other agencies the authority to refine the contours of the provision. Indeed, providing greater specificity to the "extraordinary circumstances" standard was evidently among the goals of the regulatory efforts of the Immigration and Naturalization Service ("INS") and Executive Office for Immigration Review ("EOIR"), which promulgated interim regulations governing asylum procedures in 1997 and permanent ones in 2000, 65 Fed. Reg. 76121-01 (Dec. 6, 2000). The final rules provided that the applicant bears the burden of showing "that the delay was rea-

sonable under the circumstances." 8 C.F.R. § 208.4(a)(5). The new regulations also amended the interim provision on "Temporary Protected Status" to include as a possible extraordinary circumstance "lawful immigrant or nonimmigrant status." 8 C.F.R. § 1208.4(a)(5)(iv). The agency explained this amendment by stating in the Preamble to the permanent regulations that "lawful . . . status" was added to the list "because there are sound policy reasons to permit persons who [a]re in a valid immigrant or nonimmigrant status, or [a]re given parole, to apply for asylum within a reasonable time after termination of parole or immigration status." 65 Fed. Reg. 76121-01 at 76123. Nonetheless, the

> Department would expect a person in that situation to apply for asylum . . . within a very short period of time after the expiration of her status. . . . Generally, the Department expects an asylum-seeker to apply as soon as possible after expiration of his or her valid status . . . . Clearly, waiting six months or longer after expiration or termination of status would not be considered reasonable.

*Id.* at 76123-24.

**[6]** Contrary to the government's suggestion in this appeal, we find that these regulations provide standards sufficient to permit meaningful judicial review. First, the regulations set out a non-exhaustive list of six potentially qualifying "extraordinary circumstances." Clearly, this list provides a partial adjudicative standard in and of itself. *See* 8 C.F.R. § 1208.4(a)(5)(i)-(vi). Second, the agency has taken pains to articulate the "reasonable period" standard that applies to petitioners whose temporary nonimmigrant status has expired. Indeed, asylum seekers in this predicament are cautioned that "waiting six months or longer after expiration or termination of status would not be considered reasonable." 65 Fed. Reg. 76121-01 at 76123. In light of this comprehensive regulatory scheme, we conclude that the agency has established a "mean-

ingful standard" by which we may review the BIA's "extraor-
dinary circumstances" determinations, including review of the
"reasonable period" prong in particular. *See Heckler*, 470 U.S.
at 830. Accordingly, neither the "extraordinary circum-
stances" inquiry nor its "reasonable period" corollary are dis-
cretionary agency determinations that we are precluded from
reviewing because there can be no law to apply.

**[7]** We conclude, therefore, that we have jurisdiction under
the REAL ID Act to review Husyev's claim of extraordinary
circumstances notwithstanding the jurisdiction-stripping pro-
visions of §§ 1158(a)(3) and 1252(a)(2)(B)(ii) or any other
possible limitation on review of discretionary decisions.

## B.  The    IJ's    and    BIA's    "Extraordinary Circumstances" Ruling

**[8]** Turning to the merits of Husyev's petition, we conclude
that, in a case such as this where there is no explanation for
the petitioner's delay,[3] Husyev's 364-day wait *after* his lawful
nonimmigrant status expired is not a reasonable period. As
discussed above, § 1158(a)(2)(D) clearly provides that an
alien must file his application for asylum within one year of
his arrival in the United States. We reject Husyev's argument
that he must be given one year after the expiration of his legal
status. The extraordinary circumstances provision is not
intended to "toll" the general one-year limitation. Rather it is
written in the language of an exception, excepting aliens from
the one-year requirement if they can show an extraordinary
circumstance directly "related" to the delay. Furthermore, the
term "reasonable period" used in both the interim and perma-
nent regulations suggests an amount of time that is to be

---

[3]At this stage, Husyev does not challenge the IJ's and BIA's adverse
credibility determination regarding the fraud Kaplan allegedly perpetrated
at his expense. As a result, the only fact that Husyev has established with
regard to the timeliness of his application is that it was filed 364 days after
his lawful status expired.

determined on the basis of all the factual circumstances of the case. In the absence of any special considerations, the six months period suggested in the preamble to the regulations is not an unreasonable presumptive deadline.[4] Here, Husyev has not established *any* facts that would explain his failure to file within that period of time. We have no difficulty finding persuasive the view of the IJ and BIA that 364 days is not a reasonable period after the end of lawful status in the absence of *any* established explanation for Husyev's failure to file earlier.

[9] Finally, we reject Husyev's argument that he did not receive adequate notice of the deadlines for filing his asylum application.[5] It is of course true that aliens in immigration proceedings are entitled to due process under the Fifth Amendment, *see Reno v. Flores*, 507 U.S. 292, 306 (1993), and that they are denied due process where they are not given adequate notice of procedures and standards that will be applied to their claims for relief. *See, e.g., Martinez-de Bojorquez v. Ashcroft*, 365 F.3d 800, 804 (9th Cir. 2004) (failure to notify petitioner that leaving the country would lead to forfeiture of her appeal to the BIA is a violation of due process). In this case, however, Husyev received adequate notice of the time limitations governing his asylum application. When Husyev arrived in the United States in November 1999, the regulations on

---

[4]In his oral decision, the IJ noted that Husyev must demonstrate that "he has filed within a reasonable time after falling out of status" and that he had failed to do so. We do not read the IJ's decision as inferring from the Preamble to the 2000 regulations a flat six-month limitation running from the expiration of an alien's temporary nonimmigrant status. Although we conclude that six months may serve in default as a reasonable presumptive deadline, we do not foreclose other reasonable periods, and exceptions thereto, that may be set by the agency, nor do we preclude individualized determinations of reasonableness of delay.

[5]We have jurisdiction to review this argument because it arises under the Due Process Clause of the Fifth Amendment, and the REAL ID Act restores our jurisdiction over "constitutional claims." 8 U.S.C. § 1252(a)(2)(D).

extraordinary circumstances did not indicate that temporary nonimmigrant status might qualify as an extraordinary circumstance. *See* 62 Fed. Reg. 10312-01 at 10339. Thus, at the time of his arrival, Husyev faced a firm one-year deadline, of which he undisputably had adequate notice. He was already in violation of that deadline and had overstayed his visa by more than six months when the permanent regulations were issued, permitting delay because of legal status but suggesting that a reasonable period thereafter for filing ordinarily would not exceed six months. Husyev waited an additional five months after the reasonable presumptive deadline to file. We conclude that, in these circumstances, rejection of his application as untimely did not violate Husyev's right to due process.

## II.   Withholding of Removal

[10] We next consider whether substantial evidence supports the IJ's denial of Husyev's petition for withholding of removal. Under the substantial evidence standard, we must uphold the IJ's decision unless the evidence compels a reasonable factfinder to reach a contrary result. *Singh-Kaur v. INS*, 183 F.3d 1147, 1149-50 (9th Cir. 1999). "To qualify for withholding of removal, [Husyev] must demonstrate that it is more likely than not that he would be subject to persecution on one of the [statutorily] specified grounds." *Al-Harbi v. INS*, 242 F.3d 882, 888 (9th Cir. 2001) (internal quotation marks and citation omitted); *see also* 8 C.F.R. § 1208.16(b)(2).

The IJ concluded that Husyev's testimony was not credible primarily because of a significant "inconsistency" in his version of the story over time. The inconsistency—or, to be more accurate, the omission—identified by the IJ consists of Husyev's failure to mention in his asylum application and interview the fifteen speeches that he gave in Ukraine in the early 1990s to denounce the persecution of ethnic minorities at the hands of Ukranian ultra-nationalists. We conclude that

the IJ's adverse credibility determination is supported by substantial evidence.

**[11]** There is no dispute that Husyev failed to mention his numerous political speeches in his initial application for asylum and interview with the asylum officer. The question, then, becomes whether Husyev's political advocacy amounted to a "mere . . . detail[ ]" or went to the heart of his asylum claim. *Singh v. Gonzales*, 403 F.3d 1081, 1085 (9th Cir. 2005) (quoting *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000)). On the weight of this record, evidence of Husyev's past participation in high-visibility political advocacy would provide some of the strongest evidence supporting an inference that he may be persecuted if returned to Ukraine. Indeed, Husyev himself mentioned his alleged public appearances among the cardinal reasons why he claims to be at a greater risk of future persecution than other ethnic Russians living in Ukraine. Thus, we have little doubt that Husyev's omission of his political activism in his application and interview goes to the heart of his claim. *Li v. Ashcroft*, 378 F.3d 959, 962 (9th Cir. 2004). *See also Wang v. INS*, 352 F.3d 1250, 1257 (9th Cir. 2003) ("It strains credulity to believe that [petitioner] would fail to mention in either his asylum applications or his previous sworn testimony the alleged death of a stillborn child—the very incident that supposedly formed the basis for the Chinese government's alleged sterilization attempt"); *Alvarez-Santos v. INS*, 332 F.3d 1245, 1254 (9th Cir. 2003) ("It is simply not believable that an applicant for asylum would fail to remember, and thus to include in either of his two asylum applications or his principal testimony, a dramatic incident in which he was attacked, stabbed, and fled to the mountains—the very incident that precipitated his flight . . . —only to be reminded of it at the conclusion of his testimony . . . ."). Because Husyev's omission of his political speeches is one of the grounds identified by the IJ, is supported by substantial evidence and goes

to the heart of Husyev's claim, we accept the IJ's adverse credibility finding. *See Wang,* 352 F.3d at 1259.[6]

## III.   Convention Against Torture

On this appeal, Husyev has not advanced any arguments in support of his claim for relief under the Convention Against Torture. We therefore conclude that he has waived this ground for relief. *See Kim v. Kang*, 154 F.3d 996, 1000 (9th Cir. 1998) (federal courts of appeal "will not ordinarily consider matters on appeal that are not specifically and distinctly argued in appellant's opening brief").

## CONCLUSION

For these reasons, we deny Husyev's petition for review with respect to his applications for asylum, withholding of removal, and relief under the Convention Against Torture.

## PETITION FOR REVIEW DENIED.

---

[6]Because we must accept the IJ's adverse credibility finding if *any* of the supporting grounds proffered in the IJ's decision is valid, *Wang,* 352 F.3d at 1259, we do not reach the IJ's other grounds for discrediting Husyev's testimony.