# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SANJEEB SHARMA DHITAL,
                    *Petitioner,*

v.

MICHAEL B. MUKASEY, Attorney
General,

                    *Respondent.*

No. 06-75043

Agency No.
A79-625-778

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 14, 2008—San Francisco, California

Filed July 17, 2008

Before: Diarmuid F. O'Scannlain and
Michael Daly Hawkins, Circuit Judges, and
James V. Selna,* District Judge.

Per Curiam Opinion;
Concurrence by Judge O'Scannlain

---

*The Honorable James V. Selna, United States District Judge for the
Central District of California, sitting by designation.

8883

**COUNSEL**

Elisa C. Brasil, Law Offices of Kaiser and Capeci, San Francisco, California, argued the cause for the petitioner and was

on the opening brief; Dominic E. Capeci, Law Offices of Kaiser and Capeci, San Francisco, California, filed the briefs.

Sarah Maloney, Attorney, Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, DC, argued the cause for the respondent; Greg D. Mack, Senior Litigation Counsel, Office of Immigration Litigation, filed a brief; Annette J. Clark, Of Counsel, Office of Immigration Litigation, Terri Scadron, Assistant Director, Office of Immigration Litigation, and Peter D. Keisler, Assistant Attorney General, Civil Division, were on the brief.

## OPINION

PER CURIAM:

We must decide whether an Immigration Judge properly denied admissibility to a noncitizen student who admitted to having previously obtained asylum under a false identity.

I

A

Sanjeeb Sharma Dhital, a native and citizen of Nepal, was admitted to the United States on an F-1 student visa in 1998. Dhital enrolled at Lincoln University in San Francisco, California, and later transferred to Laney College in Oakland, California. In January 2003, Dhital failed to enroll in the next semester of classes at Laney College and has not attended any educational institution since.

On September 2, 2004, approximately twenty months after Dhital's last day in school, the Department of Homeland Security, Immigrations and Customs Enforcement ("ICE") served him with a Notice to Appear, alleging that his failure

to attend classes was a violation of his student visa that rendered him removable under 8 U.S.C. § 1227(a)(1)(C)(i).

At a hearing before an immigration judge ("IJ"), Dhital admitted the allegations in the Notice to Appear and conceded removability. He also applied for asylum, withholding of removal, protection under the Convention Against Torture ("CAT"), and voluntary departure. In addition, he confessed that he previously had been granted asylum under a false identity.

B

Dhital claims he was a popular political activist in Nepal who opposed the Maoists, an insurgent group that has fought against Nepal's constitutional monarchy since 1996. According to Dhital, he was approached in January 1997 by a Maoist leader who encouraged him to join the Maoist movement and threatened to harm him if he did not. Dhital refused the overture, and he was attacked outside his home four months later by the Maoist leader and a group of five or six other people. Eight months after such incident, Dhital applied for a student visa to come to the United States, an act he claims was motivated by fear of further retribution by the Maoists.

Once he arrived here, Dhital alleges that he started writing anti-Maoist articles and sending them to a friend to distribute in Nepal. In response, Maoists went to Dhital's parents' home in Nepal and threatened to kill Dhital unless he ceased his writing campaign and paid the group a ransom. Dhital continued sending his letters, but began signing them under various pseudonyms. The Maoists were not fooled and again told Dhital's parents that they would harm Dhital unless he abandoned his efforts. Soon after, Dhital claims that the Maoists seized his parents' land and that his sister fled the country.

As a result of these developments, Dhital says he feared that the Maoists' "international network" would pursue him in

the United States. Accordingly, he alleges that he assumed a "very low profile" and acquired a fraudulent Bhutanese national identity card containing his photograph and the name "Pugman Sharma." He decided to apply for asylum using the false ID, later explaining that he believed it was the only way he could obtain legal status in the United States and that it offered the additional benefit of allowing him to avoid detection by the Maoists.

Thus, claiming to be Sharma, Dhital hired an attorney and explained that he was a Bhutanese citizen of Nepali origin and Hindu beliefs who was fleeing religious persecution in Bhutan. Dhital spoke Hindi to the attorney, purporting to speak very little English, and told the attorney that he escaped Bhutan in 2000 and entered the United States without inspection by crossing the Canadian border. The attorney then filed an asylum application on Sharma's behalf, and Dhital repeated his story during an asylum interview and at a hearing before an IJ. The IJ granted Sharma's application for asylum.

## C

Two weeks later, Dhital declined to enroll in the next semester of classes at Laney College. At the same time, he began introducing himself as Sharma and, soon after, used Sharma's asylee status to obtain a refugee travel document, visa, driver's license, social security number and employment authorization card; to open a bank account; and to travel to India. Dhital also applied for permanent resident status under Sharma's name. Dhital did not entirely abandon his true identity, however. He renewed his Nepalese passport in 2002 under his true name and address and used the same information to apply for 11 credit cards over the Internet between 2001 and 2003.

On September 2, 2004, after discovering that Dhital had not attended classes for approximately twenty months, agents from ICE arrived at his home and served him with a Notice

to Appear. Dhital never attempted to convince the officers that he was Sharma, but he was unable to produce any identification documents, explaining that he had given them to a friend for "security reasons." He later explained that he destroyed other materials, such as the anti-Maoist articles he allegedly wrote, for the same purpose.

D

Dhital, represented by new counsel, received a removal hearing before the same IJ who granted Sharma's application for asylum. The IJ denied each of Dhital's claims for relief. The Board of Immigration Appeals ("BIA" or the "Board") affirmed in a separate opinion, concluding that Dhital's first asylum application was a frivolous filing that permanently barred him from obtaining such relief under 8 U.S.C. § 1158(d)(6). In the alternative, the BIA determined that Dhital's second asylum application was untimely because it was filed more than one year after Dhital entered the United States and no "extraordinary circumstances" justified the delay. *See id.* § 1158(a)(2)(D). Next, the BIA affirmed the IJ's determination that Dhital's lack of credibility rendered him ineligible for withholding of removal. Finally, the BIA determined that Dhital did not qualify for CAT relief because he failed to present any credible evidence that he would be tortured upon his return to Nepal by the Nepalese government or by the Maoists with the government's acquiescence.[1]

Dhital timely filed this petition for review.

---

[1]On June 15, 2006, Dhital filed a motion to reopen, which the Board denied based on Dhital's lack of credibility. Dhital has not petitioned for review of that decision, nor has he petitioned for review of the BIA's dismissal of his claim for voluntary departure.

II

A

**[1]** Section 208 of the Immigration and Nationality Act ("INA") provides that "[i]f the Attorney General determines that an alien has knowingly made a frivolous application for asylum and the alien has received the notice under paragraph (4)(A), the alien shall be permanently ineligible for any benefits under this chapter." 8 U.S.C. § 1158(d)(6); *see id.* § 1158(d)(4)(A) (stating that "[a]t the time of filing an application for asylum, the Attorney General shall . . . advise the alien of the privilege of being represented by counsel and of the consequences, under paragraph (6), of knowingly filing a frivolous application for asylum"). Dhital does not dispute the BIA's substantive determination that his first application was frivolous, but argues that he did not receive adequate notice of the consequences of his action.

**[2]** In a recent decision, the BIA provided guidance as to when an asylum application may be found frivolous in accordance with the INA and applicable regulations. *See In re Y-L-*, 24 I. & N. Dec. 151, 155 (2007). However, the BIA dismissed Dhital's appeal seven months before it decided *In re Y-L-*. In another case where the BIA's decision pre-dated *In re Y-L-* and where the petitioner also challenged the adequacy of notice, we remanded the petition for review so that the BIA could "apply the standards set forth in *In re Y-L-* to Petitioner's case in the first instance." *Kalilu v. Mukasey*, 516 F.3d 777, 779 (9th Cir. 2008) (per curiam); *see also Ahir v. Mukasey*, 527 F.3d 912, 916-18 (9th Cir. 2008) (declining to remand an identical claim only because the petitioner failed to exhaust such claim before the BIA).

**[3]** If the BIA's frivolousness determination were the sole basis on which it denied Dhital's asylum application, a remand would also be required here. However, because the BIA articulated an alternative ground for its decision, we turn

to that ground to determine whether it is sufficient to support the BIA's decision.

B

The INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, requires an asylum application to be filed "within 1 year after the date of the alien's arrival in the United States." 8 U.S.C. § 1158(a)(2)(B). There are two exceptions to this rule: if "the alien demonstrates to the satisfaction of the Attorney General either [1] the existence of changed circumstances which materially affect the applicant's eligibility for asylum or [2] extraordinary circumstances relating to the delay in filing an application," the agency may grant his application even if it is filed after the one-year deadline. *Id.* § 1158(a)(2)(D). Dhital did not submit his second asylum application until six years after he arrived in the United States, and the BIA found no "extraordinary circumstances" to justify the delay.

1

We have jurisdiction to review the BIA's ruling on this question. Although 8 U.S.C. § 1158(a)(3) provides that "[n]o court shall have jurisdiction to review any determination of the Attorney General" relating to the one-year filing deadline, section 106 of the Real ID Act of 2005 restored our jurisdiction over "constitutional claims or questions of law" raised in a petition for review. *Id.* § 1252(a)(2)(D). As we held in *Ramadan v. Gonzales*, 479 F.3d 646 (9th Cir. 2007) (per curiam), and *Husyev v. Mukasey*, 528 F.3d 1172 (9th Cir. 2008), such "questions of law" include the agency's application of the changed and extraordinary circumstances exceptions to undisputed facts. *Ramadan*, 479 F.3d at 650 (holding that the Board's application of the changed circumstances exception to undisputed facts presents a "mixed question[ ] of fact and law" subject to our review under section 106 of the Real ID Act); *Husyev*, 528 F.3d at 1178-79 (holding the same with

respect to the extraordinary circumstances exception); *see Sillah v. Mukasey*, 519 F.3d 1042, 1043-44 (9th Cir. 2008) (per curiam) (holding that we lack jurisdiction to review the Board's timeliness determination where the petitioner's arrival date was in dispute).[2]

Here, the date of Dhital's arrival and the date he filed his second asylum application are not in dispute. While the parties disagree over the date on which his lawful nonimmigrant status expired, the outcome of this legal argument is not a factual dispute that affects our jurisdiction to review this claim. Thus, we turn to the merits of the BIA's "extraordinary circumstances" determination.

2

**[4]** The applicable regulation provides a nonexclusive list of "extraordinary circumstances" that excuse such an untimely filing, including cases in which "[t]he applicant maintained . . . lawful immigrant or nonimmigrant status . . . *until a reasonable period* before the filing of the asylum application." 8 C.F.R. § 208.4(a)(5)(iv) (emphasis added). Dhital argues that he fits within this category because he maintained lawful non-immigrant status from his arrival in the United States in 1998 until September 2, 2004, the date ICE served him with a Notice to Appear. Dhital filed his second

---

[2]As we held in *Ramadan*, exercising jurisdiction over the BIA's application of § 1158(a)(2)(D)'s exceptions to the asylum filing deadline does not require us to review a discretionary determination by the agency as described in 8 U.S.C. § 1252(a)(2)(B). Although an alien must prove that changed or extraordinary circumstances exist "to the satisfaction of the Attorney General" to overcome the one-year bar, *id.* § 1158(a)(2)(D), this phrase "is a specification of *who* is to make the decision, rather than a characterization of that decision itself." *Ramadan,* 479 F.3d at 655 (emphasis in original). *But see Husyev*, 528 F.3d at 1179-80 (noting that *Ramadan* creates tension with *Afridi v. Gonzales*, 442 F.3d 1212, 1218 (9th Cir. 2006), in concluding section 106 of the Real ID Act does not restore our jurisdiction over discretionary determinations by the agency, but declining to resolve the question).

asylum application 76 days after being served with the Notice to Appear and argues that such delay was reasonable.

**[5]** The BIA rejected this contention, concluding that Dhital surrendered his lawful non-immigrant status when he dropped out of school in January 2003. We agree. The governing regulation states that "[a] student who drops below a full course of study without the prior approval of the [designated school official] will be considered out of status." *Id.* § 214.2(f)(6)(iii).[3] Dhital dropped below a full course of study when he declined to enroll in the spring semester of classes at Laney College in January 2003. Thus, the BIA properly determined that he lost F-1 status as of that date. Dhital did not file his second asylum application until 22 months after he failed to enroll in school and offers no explanation for such delay. *See Husyev*, 528 F.3d at 1181 (holding that "where there is no explanation for the petitioner's delay, [petitioner's] 364-day wait *after* his lawful nonimmigrant status expired is not a reasonable period"). Accordingly, substantial evidence supports the BIA's conclusion that extraordinary circumstances do not justify Dhital's untimely filing and that he is ineligible for asylum as a result.

### III

We next consider Dhital's application for withholding of removal. To establish his eligibility for such relief, Dhital must demonstrate that it is "more likely than not that [he] would be subject to persecution based on [a protected ground]" if he is removed to Nepal. *Kohli v. Gonzales*, 473 F.3d 1061, 1070 (9th Cir. 2007) (citing 8 U.S.C. § 1101(a)(42)(A)).

---

[3]The regulation further provides that "an F-1 student is admitted for duration of status. Duration of status is defined as the time during which an F-1 student is pursuing a full course of study at an educational institution . . . . The student is considered to be maintaining status *if* he or she is making normal progress toward completing a course of study." *Id.* § 214.2(f)(5)(i) (emphasis added).

The BIA affirmed the IJ's denial of Dhital's application for withholding of removal based on the IJ's conclusion that Dhital was not a credible witness.[4] Specifically, the BIA cited the IJ's acknowledgment that Dhital filed a fraudulent asylum application and that Dhital's explanation for such filing—he assumed a false identity to hide from the Maoists—was inconsistent with his simultaneous use of his true name and address to renew his Nepalese passport and to apply for 11 credit cards over the Internet. Dhital argues that these grounds do not support the agency's adverse credibility determination because they do not "go to the 'heart' " of his claim. *See Li v. Ashcroft*, 378 F.3d 959, 962 (9th Cir. 2004) (quoting *Singh v. Ashcroft*, 301 F.3d 1109, 1111 (9th Cir. 2002)).

**[6]** We have previously upheld an adverse credibility determination where the petitioner had a "propensity for dishonesty." *Don v. Gonzales*, 476 F.3d 738, 743-44 (9th Cir. 2007) (concluding that substantial evidence supported an adverse credibility determination where the petitioner "admitted lying" to the authorities in his home country because he was afraid of what would happen if he told the truth). We have also upheld an adverse credibility finding where the petitioner lied on an asylum application and failed to clarify her answers despite multiple opportunities to do so. *Kaur v. Gonzales*, 418 F.3d 1061, 1067 (9th Cir. 2005). While we evaluate Dhital's misrepresentations "in light of all the circumstances of the case," *Kaur v. Ashcroft*, 379 F.3d 876, 889 (9th Cir. 2004), we conclude that his initial filing of a fraudulent asylum application, combined with his repetition of his fabricated narrative in his asylum interview and in his first hearing before the IJ, provided the agency with a "specific, cogent reason" upon

---

[4]In the typical case, a determination by the agency that a petitioner's lack of credibility renders him ineligible for asylum will also support a determination that the petitioner is ineligible for withholding of removal. *See, e.g., Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003). In this case, however, the BIA denied Dhital's application for asylum solely on the grounds discussed above, *see supra* Part II, and considered Dhital's credibility only for purposes of withholding of removal.

which to find him incredible. *Li*, 378 F.3d at 962 (internal quotation marks omitted); *see Kaur*, 418 F.3d at 1065-67.

In addition, the inconsistency between Dhital's statement that he filed for asylum under a false identity to hide from the Maoists and his simultaneous use of his true name and address to renew his Nepalese passport and to apply for credit cards further supports the agency's determination. Contrary to Dhital's assertion, such inconsistency goes to the heart of his claim because it "concerns events central to [his] version of why he was persecuted and fled" Nepal. *Singh v. Gonzales*, 439 F.3d 1100, 1108 (9th Cir. 2006). Although Dhital did not adopt his alias until after he arrived in the United States, his alleged reason for doing so—his fear that his Maoist persecutors would find him in the United States—is quite relevant to why he left Nepal.

**[7]** Accordingly, we conclude that substantial evidence supports the BIA's affirmance of the IJ's determination that Dhital's lack of credibility prevented him from obtaining withholding of removal.

IV

Our final task is to consider whether substantial evidence supports the denial of Dhital's application for CAT relief. To obtain relief under the CAT, a petitioner "need not show that he or she would be tortured on account of a protected ground" if returned to his or her home country, but "must show that it is 'more likely than not' that he or she will be tortured, and not simply persecuted upon removal to [such] country.'" *Lanza v. Ashcroft*, 389 F.3d 917, 936 (9th Cir. 2004) (quoting *Kamalthas v. INS*, 251 F.3d 1279, 1283 (9th Cir. 2001)). In addition, the petitioner must demonstrate that he would be subject to a "*particularized threat* of torture," *id.* (emphasis added) (internal quotation marks omitted), and that such torture would be inflicted "by or at the instigation of or with the

consent or acquiescence of a public official or other person acting in an official capacity," 8 C.F.R. § 208.18(a)(1).

**[8]** The evidence Dhital offered in support of his CAT claim was his testimony and State Department reports detailing country conditions in Nepal. As noted, substantial evidence supports the BIA's determination that Dhital's testimony was not credible. Nevertheless, Dhital can demonstrate his eligibility for CAT relief if the State Department reports, standing alone, "compel[ ] the conclusion that [he] is more likely than not to be tortured" if he is returned to Nepal. *Almaghzar v. Gonzales*, 457 F.3d 915, 922-23 (9th Cir. 2006).

**[9]** The reports in the record describe an ongoing struggle between the Nepalese government and the Maoists, with atrocities, including torture, having been committed by both sides. Still, they do not indicate that Dhital would face any particular threat of torture beyond that of which all citizens of Nepal are at risk. *See id.* at 923 (explaining that although State Department reports in that case "confirm[ed] that torture takes place" in the petitioner's home country, they did not compel the conclusion that the petitioner would be subject to a particularized threat of torture if returned).

**[10]** Accordingly, we conclude that substantial evidence supports the BIA's decision to affirm the IJ's denial of Dhital's application for CAT relief.

## V

Based on the foregoing, Dhital's petition for review of the Board's decision is

**DENIED.**

O'SCANNLAIN, J., specially concurring:

I join in the court's decision because it faithfully applies our precedent in *Ramadan v. Gonzales*, 479 F.3d 646 (9th Cir. 2007) (per curiam), *reh'g en banc denied*, 504 F.3d 973 (9th Cir. 2007), as extended by *Husyev v. Mukasey*, 528 F.3d 1172 (9th Cir. 2008), to conclude that the Real ID Act of 2005 provides us with jurisdiction to review the Board of Immigration Appeals' determination that Dhital's second application for asylum was untimely and not excused by extraordinary circumstances. As I have previously explained, however, *see* 504 F.3d at 973-78 (O'Scannlain, J., dissenting from denial of rehearing en banc), I continue to believe that *Ramadan* was wrongly decided.

The Immigration and Nationality Act ("INA") authorizes immigration officials to accept an untimely application for asylum if "changed" or "extraordinary" circumstances justify the delay. 8 U.S.C. § 1158(a)(2)(D) (stating that an untimely "application for asylum of an alien *may* be considered . . . if the alien demonstrates *to the satisfaction of* the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application" (emphasis added)). The Act plainly commits the decision whether such circumstances are present to the agency's discretion, providing that "[n]o court shall have jurisdiction to review any [such] determination." *Id.* § 1158(a)(3).

The Real ID Act of 2005 created an exception to certain barriers to judicial review imposed by the INA, providing that "constitutional claims and questions of law" remain subject to our review. *Id.* § 1252(a)(2)(D). In *Ramadan*, we held that this enactment restored our jurisdiction over the agency's application of the changed circumstances exception to the asylum filing deadline in that case, reasoning that it presented a "mixed question[ ] of fact and law" that fell within the "questions of law" over which the Real ID Act vests us with

jurisdiction. 479 F.3d at 650. Yet every other court of appeals to have considered the question has held that the agency's decision to consider an untimely asylum application in cases of changed or extraordinary circumstances is a discretionary one over which we lack jurisdiction. *See Viracacha v. Mukasey*, 518 F.3d 511, 516 (7th Cir. 2008); *Zhu v. Gonzales*, 493 F.3d 588, 596 n.31 (5th Cir. 2007); *Chen v. U.S. Dep't of Justice*, 471 F.3d 315, 330-32 (2d Cir. 2006); *Ferry v. Gonzales*, 457 F.3d 1117, 1130 (10th Cir. 2006); *Sukwanputra v. Gonzales*, 434 F.3d 627, 635 (3d Cir. 2006); *Ignatova v. Gonzales*, 430 F.3d 1209, 1213-1214 (8th Cir. 2005); *Chacon-Botero v. U.S. Attorney Gen.*, 427 F.3d 954, 957 (11th Cir. 2005) (per curiam).

I am persuaded by our sister circuits and continue to believe that *Ramadan* seizes jurisdiction over a multitude of petitions for review that Congress, through unambiguous statutory text, has placed beyond our reach. Nevertheless, because *Ramadan* is controlling here, I join the court's decision.